CROCKETT & ASSOCIATES
Robert D. Crockett (SBN 105628)
*bob@bobcrockettlaw.com*
Brian D. Walters (SBN 227435)
*waltersb@bobcrockettlaw.com*
Jackie K. M. Levien (SBN 301239)
*levienj@bobcrockettlaw.com*
Chase T. Tajima (SBN 304063)
*chase@bobcrockettlaw.com*
23929 Valencia Boulevard, Suite 303
Valencia, California 91355
Tel: (323) 487-1101
Fax: (323) 843-9711

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOE 1, an individual; DOE 2, an individual; DOE 3, an individual; DOE 4, an individual; Doe 5, an individual; and DOE 6, an individual,<br><br>  Plaintiffs,<br><br>    v.<br><br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE, a California public entity,<br><br>  Defendant. | CASE NO.: 8:18-cv-01499<br><br>**PLAINTIFFS' OPPOSITION TO INTERVENORS' MOTION TO DISMISS**<br><br>Date:   November 28, 2018<br>Time:   7:30 a.m.<br>Dept:   9D<br><br>Complaint Filed: August 23, 2018 |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS .............................................................................. 1

        A.      Watchtower Investigated Allegations of the Sin of Sex
                Abuse ................................................................................................ 1

        B.      The Zalkin Law Firm Has and Will Violate the Protective
                Order ................................................................................................ 3

        C.      Plaintiffs' Privacy Rights Will be Violated by the Current
                Order ................................................................................................ 3

III.    ARGUMENT .................................................................................................. 6

        A.      The Eleventh Amendment Permits Claims Seeking
                Prospective Relief Arising out of Violations of Rights to
                Privacy and Religious Freedom ...................................................... 6

        B.      Plaintiffs Have Alleged Imminent Injury From
                Production of the Documents and Reasonably
                Anticipated Violations of the Protective Order by
                Intervenors' Counsel ....................................................................... 7

        C.      Plaintiffs' Action Does Not Moot Issue of Privacy
                Because Discovery of Plaintiffs' Names is Not Necessary
                to Pursue Relief .............................................................................. 10

        D.      Plaintiffs Are Not In Privity With Watchtower and Not
                Collaterally Estopped From Seeking Protection of Their
                Private Information ........................................................................ 11

        E.      Plaintiffs Have Alleged Facts Supporting Injunctive
                Relief ............................................................................................. 12

                1.      Plaintiffs Will Likely Succeed on the Merits of
                        Their Claims ....................................................................... 12

                2.      Plaintiffs Will Suffer Irreparable Injury to Their
                        Emotional and Physical Safety if the Letters are
                        Disclosed Unredacted ........................................................ 17

                3.      The Balance of Equities and the Public Interest
                        Favor a Preliminary Injunction Ordering Full
                        Redactions of the Letters ................................................... 18

IV.     CONCLUSION .............................................................................................. 21

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Cottrell*

   632 F.3d 1127 (9th Cir. 2011)........................................................12

*Ariz. Dream Act Coal. v. Brewer*

   855 F.3d 957 (9th Cir. 2017)........................................................18

*Belling v. DDP Holdings, Inc.*

   No. EDCV121855MMMOPX, 2013 WL 12140986 (C.D. Cal.

   May 30, 2013)........................................................10

*California Parents for Equalization of Educ. Materials v. Torlakson*

   267 F. Supp. 3d 1218 (N.D. Cal. 2017) ........................................................15

*Conti v. Watchtower Bible & Tract Soc'y of New York, Inc.*

   (2015) 235 Cal.App.4th 1214........................................................10

*Doe No. 1 v. Reed*

   697 F.3d 1235 (9th Cir. 2012)........................................................11

*Eastwood v. Dep't of Corr.*

   846 F.2d 627 (10th Cir. 1988)........................................................8

*Edwards v. Aguillard*

   482 U.S. 578 (1987) ........................................................15

*Employment Division v. Smith*

   494 U.S. 872 (1990) ........................................................19

*Ex Parte Young*

   209 U.S. 123 (1908) ........................................................7

*Fireman's Fund Ins. Co. v. City of Lodi*

   302 F.3d 928 (9th Cir. 2002)........................................................7

*Flynn v. Higham*

   149 Cal.App.3d 677 (Cal.App. 1983) ........................................................12

*Grove v. Mead Sch. Dist. No. 354*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

753 F.2d 1528 (9th Cir. 1985) .................................................................. 14

*Hernandez v. Sessions*

872 F.3d 976 (9th Cir. 2017) ................................................................... 18

*In re Grand Jury Investigation*

918 F.2d 374 (3d Cir. 1990) .................................................................... 17

*L.A. Gay & Lesbian Ctr. v. Superior Court*

194 Cal. App. 4th 288 (2011) .................................................................. 18

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*

752 F.3d 755 (9th Cir. 2014) ................................................................... 18

*Lemon v. Kurtzman*

403 U.S. 602 (1971) ................................................................................ 15

*Lopez v. Candaele*

630 F.3d 775 (9th Cir. 2010) ................................................................... 10

*Los Angeles County Bar Ass'n v. March Fong Eu*

979 F.2d 697 (9th Cir. 1992) ..................................................................... 7

*Melendres v. Arpaio*

695 F.3d 990 (9th Cir. 2012) ................................................................... 18

*Milliken v. Bradley*

433 U.S. 267 (1977) ................................................................................... 7

*Miofsky v. Superior Court,*

703 F.2d 332 (9th Cir. 1983) ................................................................ 7, 10, 11

*Padron v. Watchtower Bible and Tract Society of New York, Inc.*

16 Cal.App.5th 1246 (2017) ...................................................................... 3

*Rodriguez v. Robbins*

715 F.3d 1127 (9th Cir. 2013) ................................................................. 18

*Scott v. Hammock*

870 P.2d 947 (Utah 1994) ........................................................................ 17

*Sealed Plaintiff #1 v. Farber*

212 F. App'x 42 (2d Cir. 2007)..................................................................13

*Stafford-Pelt v. California*

No. C-04-00496 (N.D. Cal. June 20, 2005) ...........................................13

*Sterling v. Borough of Minersville*

232 F.3d 190 (3d Cir. 2000) ...................................................................13

*Stevens v. Harper*

213 F.R.D. 358 (E.D. Cal. 2002).............................................................8

*Thorne v. City of El Segundo*

726 F.2d 459 (9th Cir. 1983) ............................................................8, 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer*

137 S. Ct. 2012 (2017) ............................................................................14

*United States v. Baker*

672 F. Supp. 2d 771 (E.D. Tex. 2009) ....................................................18

*Walz v. Tax Com. of N.Y.*

397 U.S. 664 (1970) ................................................................................15

*Welch v. Brown*

58 F. Supp. 3d 1079 (E.D. Cal. 2014) ....................................................16

*Whalen v. Roe*

429 U.S. 589 (1977) ...........................................................................7, 13

*Williams v. Winco Holdings, Inc.*

No. 116CV00508DADSAB, 2016 WL 3648967 (E.D. Cal. July 7,

2016)........................................................................................................10

**STATUTES**

Cal. Evid. Code § 1032..............................................................................18

Cal. Evid. Code § 1033.........................................................................15, 18

Cal. Evid. Code § 1034.........................................................................15, 19

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

On May 17, 2018, Defendant California Superior Court of Orange County in *Roe 1 vs. Defendant Doe 1, Congregation,* Case No. 30-2014-00741722-CU-PO-CJC, ordered the disclosure of hundreds of letters that detail childhood sexual abuse that were reported to the national offices for Jehovah's Witnesses in the United States. The order, however, failed to protect the privacy rights of those mentioned in the letters, including the Plaintiffs in this action.  Plaintiffs are, largely, innocent congregants and family members.

Defendant's order permitted redactions of only the names of victims, third-party participants, and elders, but not of other identifying information such as the names of family members, city, state, dates, location of congregation, and the name of the accused perpetrator. Because Jehovah's Witnesses' congregations are small and victims often share the surname of the accused perpetrator, it would be easy to identify victims with the information contained in these letters.

Plaintiffs' complaint seeks to protect their privacy rights by requesting that the district court enjoin enforcement of Defendant's production order until it is modified to permit full redaction of all identifying information.  The Does have no interest in the underlying merits of the *Roe 1* litigation.

## II.   STATEMENT OF FACTS

### A.   Watchtower Investigated Allegations of the Sin of Sex Abuse

Watchtower Bible and Tract Society of New York is a non-profit organization that supports the faith of Jehovah's Witnesses. *See* Dkt. 1 (Compl.) at ¶ 12. On March 14, 1997, in an effort to ensure the spiritual purity of the congregations of Jehovah's Witnesses in the United States, Watchtower distributed a letter to approximately 10,000 congregations (the "1997 Body of Elder Letter") instructing elders (spiritually-qualified men who take the lead in individual congregations) to send a written report to Watchtower about "anyone who is

currently serving or formerly served in a [Watchtower]-appointed position in your congregation who is known to have been guilty of child molestation in the past." *Id.* Watchtower instructed that this information should be kept in extreme confidence. *Id.*

In response to the 1997 Body of Elder Letter, hundreds of letters, comprising thousands of pages of reports, were written by congregation elders throughout the United States and sent to Watchtower. *Id.* at ¶ 13. Many of the reports include deeply private details regarding individual Jehovah's Witnesses' experiences with sexual assault, sexual abuse, and molestation. *Id.* Additionally, many of the reports include names and information about victims, perpetrators, individuals who were thought to be victims or perpetrators but in fact were not, and all sorts of third parties, including family members, friends, the elders in whom the congregant confided, Bible teachers, and other members of the community and/or congregation. *Id.*

On August 25, 2014, plaintiffs Roe 1 and Roe 2 commenced an Orange County, California sex abuse lawsuit, *Roe 1 v. Doe 1*, against a congregation and Watchtower. *Id.* at ¶ 15. During the pendency of *Roe 1 v. Doe 1*, plaintiffs propounded on Watchtower RFP Nos. 18 and 19, which sought information relating to the 1997 Body of Elder Letter. *Id.* at ¶ 16.

Watchtower filed a motion for a protective order for relief from responding to RFP Nos. 18 and 19 on grounds that responses thereto would violate the clergy-penitent privilege and violate the constitutionally-protected privacy rights of individuals identified. *Id.* at ¶ 17. Defendant Superior Court denied the motion and ordered production with limited redactions. S*ee id.*, Exh. B. For RFP 18, Watchtower is prohibited from redacting the names and identifying information of anyone who is not a victim or elder. *Id*. For RFP No. 19, Watchtower may redact identifying information for third-party victims and third-party participants. *Id*.

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

**B.     The Zalkin Law Firm Has and Will Violate the Protective Order**

On November 10, 2017, Watchtower associate general counsel Joel Taylor spoke by telephone with attorney Devin Storey of the Zalkin Law Firm, counsel for plaintiffs in *Roe 1 v. Doe 1*. Dkt. 1 (Compl.) at ¶ 18. As they discussed in the appellate decision in *Padron v. Watchtower Bible and Tract Society of New York, Inc.,*16 Cal.App.5th 1246 (2017), Storey admitted that if Watchtower produced the same letters that are at issue in this case, he would file them as an exhibit to a motion under seal and then move to have the exhibit unsealed, either himself or using a member of the press. *Id.*

Moreover, Zalkin, principal of the Zalkin Law Firm, gave an interview with that investigative reporter regarding the production order issued in *Padron v. Watchtower*. *Id.* During the interview, Zalkin discussed those documents in a manner that violated the applicable protective order. *Id.* Indeed, the Zalkin Law Firm's avowed interest is to make the documents available online. *Id.* at ¶ 30.

**C.     Plaintiffs' Privacy Rights Will be Violated by the Current Order**

Doe 1 is one of Jehovah's Witnesses. *Id.* at ¶ 22. He is the father of a victim and is named, identified, or otherwise described in a responsive letter that is subject to production without sufficient redaction. The Doe 1 letter states that in approximately 1997, Doe 1 was accused of, investigated for, and exonerated of, sexual abuse of his daughter, Doe 2, after she sustained a bruise injury to her vagina while riding a bicycle. *Id.* at ¶¶ 22-23. During the course of the investigation conducted by social services, police, and elders of the congregation, Doe 2 admitted that she had engaged in masturbation, had played in a sexual manner with a toy stuffed rabbit, and that she had watched sexually explicit movies that initiated her sexual thoughts and conduct. *Id.* Doe 2 told the investigators that her father, Doe 1, had never touched her inappropriately in any way. *Id.* Pursuant to the recommendation of the social services investigators, prosecutors declined to file charges against Doe 1 and he was exonerated. *Id.* Because Doe 1 is not a

victim or other person whose identifying information is subject to redaction under Defendant's order, Watchtower will not be permitted to redact Doe 1's name when this letter is produced. If this Court grants Intervenors' motion to dismiss, the information in the letter will become known and Doe 1 will face a serious risk of extreme harassment, humiliation, ridicule, social stigmatization, professional repercussions such as job loss or reputation harm, and physical and emotional distress. Moreover, Doe 2's identity will become known because, even though her name will be redacted as a victim, she shared her father's last name at the time. Doe 1 is concerned for his privacy as well as that of his daughter, Doe 2. *Id.* at ¶ 22. Likewise, Doe 2 will face a serious risk of extreme harassment, humiliation, ridicule, social stigmatization, professional repercussions such as job loss or reputation harm, and physical and emotional distress if her identity becomes known. *Id.* at ¶ 23. Doe 2 is concerned for her privacy. *Id.*

Doe 3 is one of Jehovah's Witnesses. *Id.* at ¶ 24. Doe 3 is a victim who is named, identified, or otherwise described in a responsive letter that is subject to production without sufficient redaction. A responsive letter states that Doe 3 was sexually abused at age 12 by her father, who fondled her breasts and touched her in the vaginal area. *Id.* As a victim, Doe 3's name will be redacted when her respective letter is produced, but her father's name will not. Doe 3 is concerned for her privacy since the abuse ended years ago in 1977 and she does not wish to be re-traumatized. *Id.*

Doe 4 is one of Jehovah's Witnesses. *Id.* at ¶ 25. Doe 4 is the father of a victim and is named, identified, or otherwise described in a responsive letter. The letter states that in the 1990s, from the ages of four to 13, Doe 4's daughter was sexually abused more than 40 times by another member of a congregation, who made her perform oral sex on him. The perpetrator was ultimately disfellowshipped after an investigation by the elders of the congregation. *Id.* Because Doe 4's name will not be redacted, Doe 4's daughter's identity will easily

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

become known through minimal effort. *Id.* Doe 4 is concerned for his privacy as well as that of his daughter, who, as a result of the abuse, has become an alcoholic, has attempted suicide, and cannot live without adult support. *Id.*

Doe 5 is one of Jehovah's Witnesses. *Id.* at ¶ 26. Doe 5 is a victim and is named, identified, or otherwise described in a responsive letter. The letter states that Doe 5 was sexually abused by her brother starting from when she was 12 and he was 14 years old. *Id.* The abuse lasted for two years. *Id.* As a victim, Doe 5's name will be redacted when the letter is produced, but her brother's name will not. Without an injunction, Doe 5's identity will become known because, even though her name will be redacted as a victim, she shares her brother's last name. *Id.* Doe 5 is concerned for her privacy. *Id.*

At all relevant times, Doe 6 was a member of a congregation of Jehovah's Witnesses. *Id.* at ¶ 27. Doe 6 and his two sons are named, identified, or otherwise described in a responsive letter. *Id.* The letter states that when Doe 6's older son was 12 years old, he watched a television program concerning different religious practices. *Id.* From that television program, his son somehow got the idea to put his mouth on his infant brother's genitals. *Id.* Although the conduct was not intentionally sexual in nature, Doe 6's older son was spiritually troubled by his behavior throughout his early teen years, until he finally confessed to his father and some elders from their congregation about what he had done. *Id.*

Doe 6 provided information about his son's actions toward his infant brother to the elders of his congregation, which was described in the letter. *Id.* The letter was written so that the elders could seek spiritual direction and advice from elders assisting Watchtower regarding whether Doe 6's older son should be considered an abuser, which was not clear given his youth and the limited nature of the conduct. *Id.* Doe 6 and his older son provided that information to receive spiritual guidance and reprieve, fully believing that it would be kept in extreme confidence, and would be shared only among the congregation elders who were involved and

5          **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

communicating with elders at Watchtower. *Id.*

Because Doe 6 and his older son are not victims, Watchtower will not be permitted to redact Doe 6's name or that of his older son. *Id.* If this Court grants Intervenors' motion to dismiss, Doe 6's younger son will be easily identified, even if his name is redacted, as they share the same last name. *Id.* Such a secular examination of this deeply personal and private matter that was solely intended for religious review would inhibit their family's ability to freely exercise their faith without fear of government intervention, including having privately confessed concerns to their spiritual leaders not kept confidential. *Id.* As Jehovah's Witnesses, they deeply believe that confession to the elders and repentance are essential to attain to salvation. *Id.* To this day, Doe 6's younger son, who is now an adult, is unaware of the investigation or his older brother's one-time physical contact, as he was just an infant at the time and no one has ever discussed this matter with him. *Id.* Moreover, Doe 6's younger son currently has a good relationship with his brother, and Doe 6 is concerned that their relationship could be damaged if the incident becomes known. *Id.* Doe 6 has grave concerns about his privacy, as well as those of both his sons, and wants to protect the voluntary confession of his son who was seeking spiritual reprieve, a confession Doe 6 encouraged him to make in confidentiality to their spiritual leaders. *Id.*

## III. ARGUMENT

## A. The Eleventh Amendment Permits Claims Seeking Prospective Relief Arising out of Violations of Rights to Privacy and Religious Freedom

In the meet and confer conference with opposing counsel, Plaintiffs agreed to dismiss their claims seeking monetary damages and vindication of state law-based rights. *See* Walters Decl. at ¶ 2. The Eleventh Amendment, conferring sovereign immunity to the states, is therefore no bar because this suit seeks to vindicate prospective federal constitutional privacy violations and does not seek monetary damages. *Los Angeles County Bar Ass'n v. March Fong Eu*, 979 F.2d

697, 704 (9th Cir. 1992) held that "the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *Id*. at 704 (citing *Ex Parte Young*, 209 U.S. 123, 155-56 (1908)). Plaintiffs seek protection against the Superior Court's imminent and prospective violation of their rights. This is precisely the type of harm that the Eleventh Amendment permits Plaintiffs to assert against state entities such as the Superior Court. *See Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 957, fn. 27 (9th Cir. 2002); *see also Milliken v. Bradley*, 433 U.S. 267, 288-90 (1977) (injunction requiring state officials to eliminate prospectively all vestiges of *de jure* segregated school system not barred by Eleventh Amendment).

Finally, Plaintiffs' claims are not barred on abstention grounds, as causes of action seeking to vindicate federal rights protected by the U.S. Constitution—as Plaintiffs' privacy and religious freedom rights plainly are—can be brought in federal court against state entities. *See Whalen v. Roe*, 429 U.S. 589, 591-93 (1977) (recognizing a constitutional "interest in avoiding disclosure of personal matters"); *Miofsky v. Superior Court,* 703 F.2d 332 (9th Cir. 1983) (federal action brought to protect the privacy rights in sex abuse case; abstention rejected).

**B.    Plaintiffs Have Alleged Imminent Injury From Production of the Documents and Reasonably Anticipated Violations of the Protective Order by Intervenors' Counsel**

Plaintiffs have standing to assert their claims because they have properly alleged that they will suffer an imminent, concrete, and particularized injury if documents containing their private information are produced without redactions pursuant to the May 17 Order. Each of Plaintiffs have alleged that they face a serious risk of extreme harassment, humiliation, ridicule, social stigmatization, professional repercussions such as job loss or reputation harm, and physical and emotional distress if the information in the documents becomes known to the attorneys, experts, and possibly others in the State Litigation and elsewhere. *See*

Dkt. 1 (Compl.) at ¶¶ 22-27. Contrary to Intervenors' claims, Plaintiffs do not have to have *already* suffered injuries resulting from such production; it is sufficient to show that injury is reasonably likely to occur imminently upon production—that is the very meaning of the word "imminent." *See Stevens v. Harper*, 213 F.R.D. 358, 372 (E.D. Cal. 2002) (plaintiff "satisfied the imminent injury requirement" where plaintiff identified specific practice of defendant that would directly affect plaintiff and supported "reasonable inference" that defendant's practice would harm plaintiff). Plaintiffs make this showing in two ways.

First, Plaintiffs will be injured at the moment production pursuant to the current May 17 Order occurs, as production of the documents containing Plaintiffs' private information without redactions violates their privacy and First Amendment rights. *See, e.g.*, *Thorne v. City of El Segundo*, 726 F.2d 459, 467 (9th Cir. 1983) ("privacy of her sexual activities are within the zone protected by the constitution."); *Eastwood v. Dep't of Corr.*, 846 F.2d 627, 631 (10th Cir. 1988) ("constitutionally protected right [to privacy] is implicated when an individual is forced to disclose information regarding personal sexual matters."). Production of the documents will make their contents known to Intervenors' counsel, which is an injury in itself where, as here, production violates Plaintiffs' informational privacy. Plaintiffs have demonstrated imminent injury by alleging that the documents will be produced without redaction of their names or other identifying information; nothing further is required.

Second, Plaintiffs will be injured when their private information becomes known outside of the State Litigation, which is more than reasonably likely to occur because the Zalkin Firm has already violated applicable protective orders governing the documents and has professed it is willing to do so to get the documents into the public domain. *See* Dkt. 1 (Compl.) at ¶¶ 18, 28, 30. Contrary to Intervenors' claims, the risk of injury to Plaintiffs by counsel's violations of the protective order are not speculative—past instances of violations are demonstrable,

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

1   as are statements confirming that counsel intends to do so again. *Id.*; *see also* Mot.

2   at 8-9. The radio interview given by Irwin Zalkin and attached to Intervenors'

3   motion as Exhibit 2 demonstrates as much. Despite being keenly aware he is under

4   a duty not to disclose the documents, Zalkin coyly discussed contents, including

5   the manner of preparation (Mot. Exh. 2 at 3), that they discuss known molesters

6   and their parents (*id.*), that the documents pertain to relationships in the community

7   (*id.* at 4) and complaining about being gagged.  (*Id.* at 5.) "It's pretty hard. We're

8   trying our best to expose this truth and they're doing everything they can to

9   interfere with that effort." *Id.*

10       Asked if he would hypothetically show the files to the police, Zalkin replied,

11  "I *probably* would not show them that. Right, they would not be able to unless they

12  break into those cabinets." *Id.* at 15 (emphasis added.) Asked if the documents

13  would stay secret, Zalkin replied, "For the time being, yes." *Id.* The reporter

14  admitted that "I actually got ahold of one of these documents a couple years ago.

15  It's a simple one-page form with nine questions exactly like documents Irwin

16  [Zalkin] has now." *Id.* at 3-4. It is unclear how he obtained the document.

17  Moreover, Intervenors' claim that the statements were made before Zalkin had

18  obtained any documents is flatly contradicted by the interview, in which Zalkin

19  states that the documents are located in the very room in which the interview took

20  place. *Compare* Mot. at 11, *with* Mot. Exh. 2 at 1, 15 ("Q. Are they in this office?

21  A. Yes."). Given these public statements, Plaintiffs have alleged a non-speculative

22  and non-hypothetical injury resulting from the Zalkin Firm's demonstrable

23  violations of the protective order and the reasonable inference that the Zalkin Firm

24  will do so again.

25       Moreover, with respect to the alleged violations of Plaintiffs' religious

26  freedoms, because "[c]onstitutional challenges based on the First Amendment

27  present unique standing considerations," plaintiffs may establish an injury in fact

28  without first suffering a direct injury from the challenged restriction. *Lopez v.*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

*Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). Plaintiffs' allegations that the production of the documents will compromise their ability to practice their faith are thus sufficient to establish injury to their First Amendment rights.

Given these allegations, Plaintiffs' injuries are neither speculative or hypothetical. Promises to permit filing under seal are illusory, as certainly *someone* will see the documents initially. These innocents have nothing to do with the abuses alleged.

## C. Plaintiffs' Action Does Not Moot Issue of Privacy Because Discovery of Plaintiffs' Names is Not Necessary to Pursue Relief

Intervenors claim that Plaintiffs have essentially waived their right to privacy by initiating this litigation, which Intervenors claim has opened Plaintiffs up to discovery of their identities and other private information. *See* Mot. at 12. This is essentially an argument that a party waives their privacy rights by asserting them, which is flatly contradicted by federal law. *See, e.g.*, *Miofsky, supra,* 703 F.2d 332 (plaintiff can bring Section 1983 claim asserting privacy rights); *Belling v. DDP Holdings, Inc.*, No. EDCV121855MMMOPX, 2013 WL 12140986, at *4 (C.D. Cal. May 30, 2013) (plaintiff "does not waive his or her right of privacy" simply by asserting claims related thereto); *Williams v. Winco Holdings, Inc.*, No. 116CV00508DADSAB, 2016 WL 3648967, at *5 (E.D. Cal. July 7, 2016) (no waiver of privacy rights in action where plaintiff asserts privacy rights).

Moreover, given the limited relief that Plaintiffs seek in both this action and the State Litigation, Plaintiffs have not put their private information, such as their identities, at issue. Ultimately, Plaintiffs merely seek to prevent production of the documents containing their names, or complete redaction of information that could lead to their identification.[1] The detailed allegations of the abuse and trauma

---

[1] The May 17, 2018, order does not permit redaction of all information that could lead back to the child victim or identification of a child perpetrator. A parent's or sibling's name or the name of a congregation with incident dates could easily narrow a search. *Conti v. Watchtower Bible & Tract Soc'y of New York, Inc.* (2015) 235 Cal.App.4th 1214, 2018, acknowledged that Jehovah's Witnesses' "[c]ongregations are small and

suffered by each of Plaintiffs submitted in Plaintiffs' complaint, as well as the materials submitted in support of Plaintiffs' (who are Nonparty Does 1-6) motion for protective order in the State Litigation, including detailed declarations from each of Plaintiffs describing the sexual abuse incidences and investigations that were reported in the responses to the Body of Elder Letter and their expectation that their communications with the elders of their congregation would be kept in extreme confidence, contain more than sufficient evidence on which Intervenors may litigate this action. *See* Dkt. 1 (Compl.) at ¶¶ 22-27.

Intervenors rely on *Doe No. 1 v. Reed*, 697 F.3d 1235, 1238 (9th Cir. 2012). But Intervenors concede the *Doe No. 1* Court found it could not grant effective relief because the documents plaintiffs sought to prevent from being released had ***already been published*** to websites not under the control of the state actors. *Id.* at 1238-1239; Mot. at 12. This is both (1) entirely different from this case, because here Plaintiffs seek to prevent the imminent—but not yet already occurring— production of documents by Watchtower, a party that even Intervenors concede would not produce the documents unless ordered to by a court, and (2) irrelevant to the issue of whether Plaintiffs' suit raising their privacy rights thereby waives those privacy rights—which, for the reasons above, it does not. *See Miofsky,* 703 F.2d at 335.

**D.    Plaintiffs Are Not In Privity With Watchtower and Not Collaterally Estopped From Seeking Protection of Their Private Information**

Intervenors entire collateral estoppel argument depends on a finding that Plaintiffs are in privity with Watchtower. *See* Mot. at 16. This argument fails, as Intervenors essentially argue that a nonprofit organization affiliated with a religion is automatically in privity with individual congregants of the religion with which it is affiliated, such that those individual congregants are precluded from asserting their own privacy claims. This cannot possibly be the law, and Intervenors cite no

---

close-knit. The average congregation has 75 to 150 members." This makes it easy to identify victims.

1    cases in support of such an argument. Indeed, Intervenors can point to no

2    evidence—because none exists—that Watchtower has a representative relationship

3    with Plaintiffs or that Watchtower has specifically alleged the kind of physical,

4    emotional, and reputational harm that Plaintiffs seek to protect in this action.

5    Intervenors quote *Flynn v. Higham* for the opposite proposition: "It is well settled

6    that the right of privacy is purely a personal one; it cannot be asserted by anyone

7    other than the person whose privacy has been invaded. . . ." *See* Mot. at 19, n.6

8    (149 Cal.App.3d 677, 683 (Cal.App. 1983).) Intervenors' claims to the contrary

9    must be rejected.

10   **E.      Plaintiffs Have Alleged Facts Supporting Injunctive Relief**

11          Intervenors claim that Plaintiffs' Complaint should be dismissed because

12   they have not alleged facts supporting the injunctive relief Plaintiffs seek. A

13   motion for a preliminary injunction, however, should be granted where the plaintiff

14   establishes that (1) he is "likely to succeed on the merits," (2) he is "likely to suffer

15   irreparable harm in the absence of preliminary relief," (3) "the balance of equities"

16   tips in his favor, and (4) an "injunction is in the public interest." *All. for the Wild*

17   *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

18          Under the Ninth Circuit's sliding scale approach, "serious questions going to

19   the merits and a balance of hardships that tips sharply towards the plaintiff can

20   support issuance of a preliminary injunction, so long as" the irreparable injury and

21   public interest elements are satisfied. *Id.* at 1135.

22          **1.      Plaintiffs Will Likely Succeed on the Merits of Their Claims[2]**

23                 **a.      Count I - U.S. Const. Amends. IV, V, XIV**

24          The Supreme Court has recognized a constitutional "interest in avoiding

---

25   [2] As stated above, Plaintiffs have agreed to dismiss their privacy claim arising under
26   California law and their request for monetary relief. *See* Walters Decl. at ¶ 2. Indeed,
     Plaintiffs have engaged in substantial and productive meet and confers with counsel for
27   Defendant, in which Plaintiffs explained that they intend to seek redress first in the State
     Litigation and the parties mutually agreed to continue the dates for responding to the
28   complaint. *Id.* at ¶ 3. When Plaintiffs explained the same to Intervenors and requested to
     stay or continue deadlines related to Intervenors' motion to dismiss to permit Plaintiffs to
     seek state court relief, counsel for Intervenors would not agree. *Id.* at ¶¶ 4, 6.

disclosure of personal matters," *Whalen*, 429 U.S. at 591-93, and many of the Courts of Appeal, including the Ninth Circuit, have defined this right to include the very types of matters implicated by the documents subject to production under the May 17 Order. *See, e.g.*, *Thorne*, 726 F.2d at 467; *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n. 4 (3d Cir. 2000). A "person's status as a juvenile sex abuse victim is clearly the type of 'highly personal' information that we have long recognized as protected by the Constitution from governmental dissemination absent a substantial government interest in disclosure." *Sealed Plaintiff #1 v. Farber*, 212 F. App'x 42, 43 (2d Cir. 2007); *Stafford-Pelt v. California*, No. C-04-00496, *6-8 (N.D. Cal. June 20, 2005) (denying motion to dismiss section 1983 claims where police report regarding minor's sexual abuse was released insufficiently redacted in violation of privacy).

Where a state's conduct imposes on fundamental rights, such as the right to privacy in personal information of a sexual nature, the state must show that its conduct is narrowly tailored to further a legitimate state interest. *See Thorne*, 726 F.2d at 469. The state will not be able to make this showing, as the May 17 Order is not tailored at all with respect to Plaintiffs' privacy rights because it does not permit redaction of all information that could lead back to the child victim or identification of a child perpetrator. *See* Dkt. 1 (Compl.) at ¶¶ 22-27.

Intervenors' argument that mandatory reporting laws demonstrate that the May 17 Order does not violate Plaintiffs' rights is inapposite. The question in this case is whether the May 17 Order is narrowly tailored to further a legitimate state interest in permitting *civil discovery* of private information regarding *nonparties'* experiences of sexual abuse—not, as Intervenors' would suggest, the legitimate state interest in "allow[ing] *law enforcement* to investigate suspected child abuse." Mot. at 21 (emphasis added). The former is plainly a less compelling interest than the latter and does not permit the level of intrusion that mandatory reporting might.

### b.    Count III – U.S. Const. Amend. I

Intervenors argue that Plaintiffs' First Amendment claims will fail because the Court in the State Litigation merely found that Watchtower failed to establish the preliminary facts regarding the application of the clergy-penitent privilege set forth in Cal. Evid. Code §§ 1033, 1034. Intervenors' claims misconstrue the May 17 Order and fail to address Plaintiffs' Free Exercise and Establishment Clause claims beyond the clergy-penitent privilege. *See* Dkt. 1 (Compl.) at ¶ 38.

The "Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017). "To establish a violation of that clause, a litigant must show that challenged state action has a coercive effect that operates against the litigant's practice of his or her religion." *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985). Three factors are relevant in analysis of claims brought under the Free Exercise Clause: "(1) the extent of the burden upon the exercise of religion, (2) the existence of a compelling state interest justifying that burden, and (3) the extent to which accommodation of the complainant would impede the state's objectives." *Id.*

Plaintiffs are likely to succeed on the merits of their Free Exercise claim, as the May 17 Order "has a coercive effect that operates against" Plaintiffs' exercise of their faith as Jehovah's Witnesses. The May 17 Order, as currently issued, penalizes Plaintiffs for confiding in the elders of their Congregations during the course of spiritual investigations conducted pursuant to the practices of their faith. *See* Dkt. 1 (Compl.) at ¶¶ 22-27. Defendant has no compelling state interest justifying the burden the May 17 Order places on Plaintiffs' free exercise of their faith, as the state's interest in enforcing the Order can be accomplished without infringing Plaintiffs' First Amendment rights by permitting the redactions requested herein. Indeed, the May 17 Order does precisely that with respect to the names and identifying information of certain victims and elders. Likewise,

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

accommodation of Plaintiffs' religious liberties would place no burden on the state's objectives with respect to the Order, as Defendant has already recognized that redaction of certain information is a permissible mechanism of protecting the identities of individuals named in the documents while also enforcing the rules of discovery in the State Litigation.

Similarly, Plaintiffs are likely to prevail on the merits of their Establishment Clause claim. Governmental action is permissible under the Establishment Clause if (1) it has a secular purpose, (2) the principle or primary effect neither advances nor inhibits religion, and (3) it does not foster excessive state entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). If any of the three prongs of the "*Lemon* test" is not met, the government action violates the First Amendment. *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *California Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1227 (N.D. Cal. 2017). The primary effect of the May 17 Order inhibits Plaintiffs' religion, as each of Plaintiffs has submitted evidence that if their names or other identifying information (such as names of family members) are not redacted, each will suffer the penalties of extreme harassment, humiliation, ridicule, social stigmatization, and physical and emotional distress because they participated in the spiritual practice of confidentially disclosing information to the elders of their church during the spiritual investigations. *See* Dkt. 1 (Compl.) at ¶¶ 22-27.

Moreover, the May 17 Order fosters excessive entanglement with religion. For this prong, "the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Walz v. Tax Com. of N.Y.*, 397 U.S. 664, 675 (1970). Here, the May 17 Order requires "official and continuing surveillance" by the Court in the State Litigation of the production of a religious institution's documentation with respect to its spiritual investigations. This is government conduct that will "require the courts to review and interpret

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

1   church law, policies, or practices," which is "barred by the First Amendment under
2   the entanglement doctrine." *Welch v. Brown*, 58 F. Supp. 3d 1079, 1089 (E.D. Cal.
3   2014).

4        With respect to Plaintiffs' First Amendment claim arising out of violation of
5   the clergy-penitent privilege, Intervenors fail to appreciate that the May 17 Order
6   applies an unconstitutional preference for religions that mirror the Catholic
7   confessional model. It cannot be disputed that the letters that Intervenors seek to
8   discover involve penitential communications from congregants to church elders
9   (such as Doe 2's confession of masturbation (*see* Dkt. 1 (Compl.) at ¶ 23), or Doe
10  6's confiding to elders about his son's youthful abuse of his infant sibling (*id.* at ¶
11  27), that are protected from discovery by the clergy-penitent privilege even though
12  these admissions do not fit the Catholic confessional model. Disclosures are made
13  to Church elders who discuss the abuse with supervisors as part of the spiritual
14  process of remedying the situation; these are precisely the sorts of religious
15  communications the privilege was meant to protect.

16       "Subject to Section 912, a penitent, ***whether or not a party***, has a privilege
17  to refuse to disclose, ***and to prevent another from disclosing***, a penitential
18  communication if he or she claims the privilege" (emphasis added). Cal. Evid.
19  Code § 1033. "As used in this article, 'penitential communication' means a
20  communication made in confidence, in the presence of no third person so far as the
21  penitent is aware, to a member of the clergy who, in the course of the discipline or
22  practice of the clergy member's church, denomination, or organization, is
23  authorized or accustomed to hear those communications and, under the discipline
24  or tenets of his or her church, denomination, or organization, has a duty to keep
25  those communications secret." Cal. Evid. Code § 1032. Plaintiffs Does 1-6 hold
26  the section 1033 privilege and so can prevent others from producing, testifying to,
27  or otherwise disclosing their privileged communications.

28       Indeed, a finding that the privilege does not apply or that Plaintiffs waived

the privilege (as suggested by Intervenors and the May 17 Order), whether due to their own conduct or the conduct of the elders with whom they communicated, runs afoul of the Establishment Clause. Many of the individuals named in the documents sought are elders required by the tenets of Jehovah's Witnesses to keep confidential the communications from congregants and only to share the communications to the limited extent allowed within the spiritual hierarchy of Jehovah's Witnesses. Dkt. 1 (Compl.) at ¶¶ 12-14. The elders who disclosed those communications in the letters sent to Watchtower did so consistent with the discipline of the religious body and had a justified belief that such communications maintained the clergy-penitent privilege within the meaning of section 1034. *Id.* "The extent to which a clergyman should keep secret or reveal penitential communications is not an appropriate subject for legislation; the matter is better left to the discretion of the individual clergyman involved and the discipline of the religious body of which he is a member." Cal. Evid. Code § 1034 (7 Cal.L.Rev.Comm. Reports 1 (1965)).

The Third Circuit, in *In re Grand Jury Investigation*, 918 F.2d 374, 387 n.21 (3d Cir. 1990), acknowledged that "restricting the clergy-communicant privilege to Roman Catholic penitential communications, for example, would raise serious establishment clause concerns." The Utah Supreme Court held, "Reading the privilege statute narrowly would create the risk that the law would be discriminatorily applied against religious practices of churches on the basis of theological differences as to how reconciliation with God is to be achieved." *Scott v. Hammock*, 870 P.2d 947, 954 (Utah 1994).

## 2. Plaintiffs Will Suffer Irreparable Injury to Their Emotional and Physical Safety if the Letters are Disclosed Unredacted

Intervenors claim that Plaintiffs cannot establish irreparable injury, and merely recycle arguments made above regarding the imminence of the harm Plaintiffs will suffer. Intervenors are wrong that "a convoluted series of events

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

must occur before Does 1-6 will suffer their alleged injury." Mot. at 17. Instead, Plaintiffs will suffer their imminent injury the moment documents are produced without redactions to protect their privacy. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (*quoting Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Dissemination of records of child sexual abuse "causes irreparable harm to some of the weakest members of society." *United States v. Baker*, 672 F. Supp. 2d 771, 773 (E.D. Tex. 2009) (child pornography). The harm is irreparable because review on appeal "will not cure the disclosure of protected information." *L.A. Gay & Lesbian Ctr. v. Superior Court*, 194 Cal. App. 4th 288, 300 (2011).

### 3. The Balance of Equities and the Public Interest Favor a Preliminary Injunction Ordering Full Redactions of the Letters

The final two elements of the preliminary injunction test—the balance of the equities and the public interest—merge when the government is a party. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). The government has no interest in issuing orders that violate the Constitution. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[Government] cannot suffer harm from an injunction that merely ends an unlawful practice."); *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law.").

Intervenors claim—without any evidence, and contrary to Plaintiffs' specific allegations regarding why they initiated this suit, *see* Dkt. 1 (Compl.) at ¶¶ 22-27—that Does 1-6 have no legitimate interest in seeking an injunction granted because this lawsuit was filed "for the purpose of keeping Watchtower from facing discovery sanctions for its non-compliance with the May 17 Order." Mot. at 22. Intervenors ignore Plaintiffs' indisputable interest in protecting their privacy and

1    that of their family-member victims.

2        Privacy is not the only fundamental right implicated. Defendant's protective

3    order places an undue burden on Plaintiffs' freedom to practice their faith when

4    seeking spiritual guidance from Jehovah's Witnesses elders. If congregants fear

5    disclosure of their spiritual communications, the government will have effectively

6    suppressed this practice. While the Free Exercise Clause typically does not excuse

7    compliance with otherwise neutral and generally applicable laws and court orders,

8    the Supreme Court has recognized a "hybrid situation" where religious practice is

9    infringed by a law that also encroaches on another fundamental right. *Employment*

10   *Division v. Smith*, 494 U.S. 872, 881 (1990) ("[I]t is easy to envision a case in

11   which a challenge on freedom of association grounds would likewise be reinforced

12   by Free Exercise Clause concerns.") Here, Defendant's order implicates the priest-

13   penitent privilege, as the order stated that the priest-penitent privilege was

14   somehow broken when the elders wrote to Watchtower reporting the sexual abuse.

15   This demonstrates an unconstitutional preference for Catholic models of

16   confession.

17       The public interest also favors an injunction. As alleged in Plaintiffs'

18   Complaint, the 1997 Body of Elder Letter was part of Watchtower's effort to

19   ensure the spiritual cleanness and purity of the congregations of Jehovah's

20   Witnesses in the United States by collecting information about, investigating, and

21   protecting congregants from, abuse. Dkt. 1 (Compl.) at ¶ 12. Written

22   communication about suspected child molesters allows the congregation to remain

23   vigilant. Victims, if they so choose, may come forward to have the authorities

24   investigate, as was the case with Doe 4. *Id.* at ¶ 25. Indeed, Doe's 4's story

25   demonstrates the value in making congregants feel safe to communicate with their

26   elders, as the person who abused Doe 4's daughter was ultimately

27   disfellowshipped, thereby protecting the congregation from further abuse. *Id.* The

28   relief Plaintiffs seek furthers this purpose, as redaction of the documents will

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

protect Plaintiffs' privacy and ensure that congregants continue to seek spiritual guidance from their elders on these matters, which guidance ultimately results in safety for their religious communities. Likewise, the relief Plaintiffs seek ensures that survivors of abuse who are identified in the documents will not wake up one morning to discover that deeply personal and private matters they had discussed in a confidential religious setting have become publicly available on the Internet. *See id.* at ¶ 30. It is in the public interest to prevent the genuine risk that these survivors may engage in self-harm or suicide. *Id.*; *see also id.* at ¶ 25 (Plaintiff Doe 4 faces genuine risk that his daughter, a survivor of abuse, may again attempt suicide if information that could lead to her identification is produced).

Intervenors, on the other hand, do not have a legitimate interest in Plaintiffs' constitutionally-protected information. Plaintiffs are nonparties in the State Litigation whose names are totally irrelevant to Intervenors' claims. Intervenors' argument that they need the documents at issue, in unredacted form, to show "Watchtower's institutional awareness of the prevalence of child molestation within the organization" does not pass the straight-face test, as redacted documents would be perfectly sufficient for this purpose. Moreover, the frivolity of this claim demonstrates Intervenors' true purpose in seeking the documents unredacted—to file additional lawsuits against Watchtower with Plaintiffs' private information and privileged communications as hostages for the ransom. Plaintiffs' lawsuit, which is about protecting themselves from the imminent physical, emotional, and reputational harm of a violation of their privacy rights, is far more aligned with public and equitable interests than Intervenors' interest in the unredacted documents. It is not Plaintiffs' fault that Intervenors are approaching the five-year deadline set by California law in which to try their claims, and this deadline is not a reason to discount Plaintiffs' privacy interests. *See* Mot. at 24. Plaintiffs have thus alleged facts supporting the issuance of injunctive relief, and Intervenors' motion must be denied.

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   CONCLUSION

For the reasons stated above, Plaintiffs Does 1-6 respectfully request that the Court deny Intervenors' Motion to Dismiss.

Date: November 7, 2018                    Respectfully submitted,

                                          CROCKETT & ASSOCIATES

                                          By /s/ Robert D. Crockett
                                            Attorneys for Plaintiffs

4848-3265-9066, v. 3

21            PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS